# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARILYN MULERO, | ) | |
| | ) | |
| Petitioner, | ) | 09 C 3146 |
| | ) | |
| v. | ) | |
| | ) | Hon. Charles R. Norgle |
| SHERYL THOMPSON, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

On May 12, 1992, at approximately 12:15 a.m., Petitioner Marilyn Mulero ("Mulero") and two other individuals murdered Jimmy Cruz ("Cruz") and Hector Reyes ("Reyes") in Humboldt Park, which is located in the near northwest side of Chicago, Illinois. People v.Mulero, 680 N.E.2d 1329, 1331 (Ill. 1997). Mulero pled guilty to four counts of intentional murder before the Circuit Court of Cook County and received the death sentence. Id. On May 22, 1997, the Illinois Supreme Court affirmed Mulero's convictions, but vacated Mulero's death sentence and remanded the case to the Circuit Court for a new sentencing hearing. Id. The Circuit Court ultimately sentenced Mulero to a term of life imprisonment without the possibility of parole, and the Illinois Appellate Court affirmed. People v. Mulero, No. 99-825, slip op. at 1 (Ill. App. Ct. Nov. 19, 1999). Mulero is currently incarcerated at the Dwight Correctional Center in Dwight, Illinois where she is in the custody of Respondent Sheryl Thompson, the warden of that facility.

Before the Court is Mulero's Petition for Writ of Habeas Corpus – Person in State Custody, filed pursuant to 28 U.S.C. § 2254. For the following reasons, the Petition is denied.

## I. BACKGROUND

### A. Facts

On May 11, 1992, at approximately 11:00 or 11:30 p.m., Mulero was driving a car near Humboldt Park with passengers Jacqueline Montanez ("Montanez") and Madeline Mendoza ("Mendoza") when they encountered Ivette Rodriguez ("Rodriguez"). Mulero, 680 N.E.2d at 1332. Mulero, Montanez, and Mendoza were members of the Maniac Latin Disciples, a Chicago street gang. Id. at 1331. Someone inside the car asked Rodriguez to "make a hit with them and roll on some flakes," which Rodriguez understood as an invitation to assist in an attack on members of a rival gang, the Latin Kings. Id. at 1332. Rodriguez declined. Id. At approximately 12:30 or 1:00 a.m. on May 12, 1992, Rodriguez saw Mulero, Montanez, and Mendoza back in their neighborhood. Id. Mulero and Montanez were bragging about having murdered Cruz and Reyes. Id. Following her arrest for possession of a controlled substance later that evening, Rodriguez identified Mulero, Montanez, and Mendoza as the perpetrators of Cruz and Reyes' murders. Id. Chicago police officers arrested Mulero and Montanez on May 13, 1992. Id. Officers arrested Mendoza two days later. Id.

Following her arrest, Mulero gave a court-reported statement to a Chicago detective and an assistant State's Attorney. Id. at 1331. The Illinois Supreme Court summarized Mulero's statement:

> After waiving her *Miranda* rights, defendant was asked about the events that occurred on May 12, 1992. In her statement, defendant indicated that she belonged to the Maniac Latin Disciples gang. Defendant stated that on May 11, 1992, she,

Jacqueline Montanez and Madeline Mendoza, who were 15 and 16 years of age respectively, decided to shoot some members of the Latin Kings, a rival gang. The shootings were to avenge the death of a friend named Mudo, who was killed by some Latin Kings a couple of days earlier. Defendant stated that she obtained a small silver automatic gun to carry out the shootings. Defendant borrowed her brother's car and drove Montanez and Mendoza to look for some Latin Kings. They encountered Cruz and Reyes, who were Latin Kings, in another car. The three women and the victims all agreed to go to Humboldt Park. Defendant stated that she intended to kill Cruz and Reyes in the park. At the park, the group walked to an area of a public bathroom. According to defendant, Montanez went into the bathroom and shot Reyes, with the gun defendant had provided, while defendant remained outside. Montanez left the bathroom and gave defendant the gun. Defendant then shot Cruz in the back of the head. Defendant, Montanez and Mendoza then drove away. Both victims died of the gunshot wounds.

Id. at 1331-32.

## B. Procedural History

### 1. State Court Proceedings

The State charged Mulero by way of indictment with four counts of murder, two counts of conspiracy to commit murder, and one count of unlawful use of a firearm by a felon. Id. at 1331. The Cook County Public Defender's Office initially represented Mulero, but she later retained private attorney Jeremiah Lynch ("Lynch"). Lynch filed a motion to suppress Mulero's statement asserting that: she was not properly informed of her Miranda rights nor did she understand those rights; she was not provided with an attorney after requesting one; and the police psychologically coerced her statement. Id. at 1332. The Circuit Court denied the motion. Id.

On September 27, 1993, Mulero, represented by Lynch, entered a "blind," or unnegotiated, plea of guilty to the four counts of murder. Id. at 1331. During the plea colloquy, the Circuit Court informed Mulero that since this was a capital case, there were only two

3

sentences that could be imposed: natural life in prison or the death penalty. Resp.'s Ex. V, Tr., at 177. The Court then asked Mulero whether she understood that by pleading guilty she would be giving up certain rights, including her right to a trial and her right to force the State to prove its case beyond a reasonable doubt. Id. at 177-78. Mulero replied that she understood the rights she was giving up. Id. at 178. She also indicated that she had signed a jury waiver after conferring with Lynch. Id. The Court then asked Mulero whether anyone was forcing her to plead guilty, or promised her anything in exchange for her guilty plea. Id. Mulero answered "no" to both questions. Id. The State then articulated the factual basis for Mulero's plea, which included: Mulero's confession; Rodriguez's statement regarding the invitation she received from Mulero, Montanez, and Mendoza to "roll on some flakes"; Rodriguez's statement regarding Mulero, Montanez, and Mendoza's admission that they killed Cruz and Reyes; and the report of a forensic pathologist indicating that Cruz and Reyes died from gunshot wounds to the head. Id. at 179-183. The Court then found that Mulero knowingly and voluntarily gave up her right to trial and that there was a sufficient factual basis for the plea. Id. at 184. Because certain counts merged with others, the Court entered judgment against Mulero on two counts of intentional murder. Id.

The case then went to a capital sentencing hearing before a jury, where the State presented the following evidence at the eligibility phase of the hearing: a Chicago police detective testified to finding Cruz and Reyes' bodies at the crime scene; a forensic pathologist testified that Cruz and Reyes had been killed by close-range gunshot wounds to the back of the head; Rodriguez testified as to her encounters with Mulero, Montanez, and Mendoza the evening of May 11-12, 1992; another Chicago detective testified that he took Mulero's confession, and

explained that Mulero seemed "arrogant and cocky," and that she "was proud of herself because she had performed a mission for her 'nation'"; and an assistant State's Attorney testified that he was present for Mulero's confession, and that she seemed to have no remorse for her actions. Mulero, 680 N.E.2d at 1332-33. Mulero presented no evidence at this stage of the hearing. Id. at 1333. The jury found that Mulero was eligible for the death penalty because the murders were committed in a "cold, calculated and predetermined manner according to a preconceived plan," and because Mulero had been convicted of murdering two or more people. Id. (citing 720 ILL. COMP. STAT. 5/9-1(b)(3), (11) (formerly IL ST CH 38 ¶ 9-1 (b)(3), (11)(West 1992)).

In the second phase of Mulero's sentencing hearing, the State first presented evidence in aggravation pursuant to IL ST CH 38 ¶ 9-1 (West 1992). Two assistant State's Attorneys testified that Mulero had twice been convicted of delivery of a controlled substance, that she received a three-year prison term for the second of those offenses, and that she was paroled on February 28, 1992. Mulero, 680 N.E.2d at 1333-34. Joanne Roberts ("Roberts") testified that she encountered Mulero in the Cook County Jail in 1993, and that Mulero had asked her to kill Montanez so that Montanez could not testify against Mulero. Id. at 1334. Roberts further testified that she refused and informed the authorities. Id. Following her release from jail, Roberts stated, she received threatening telephone calls from Mulero and other Maniac Latin Disciples. Id. Finally, a Chicago detective testified that after Mulero confessed to the murders he escorted her through the police station, where she shouted gang slogans and flashed gang signals with her hands. Id. Television news cameras captured this display, and the State played the tape for the jury. Id. As the tape played, the detective testified as to the significance of Mulero's gestures:

Detective Riccio explained that defendant took her hand and placed it over her heart, which meant that what she was about to say and do was "from her heart." Next, defendant's hand was shown pointing five fingers downward, which represented a disrespectful gesture to the Latin Kings. Defendant then flipped her hand in an upright position, like a pitchfork, to show her allegiance to the Maniac Latin Disciples. Defendant also stated "KK," which Detective Riccio stated meant "king killers," and was a form of disrespect to the Latin Kings.

Id.

In mitigation, Lynch presented the following evidence on Mulero's behalf. A teacher in the Cook County Jail testified that Mulero volunteered to act as a tutor in his educational program, and a social worker in that program testified that Mulero was a well-liked and friendly peer leader. Id. Two correctional officers testified that Mulero was affable, easygoing, respectful, and did not engage in gang-related behavior. Id. Mulero's mother testified that she brought Mulero's children to visit her in jail every week, and that Mulero loved her children. Id. Mulero testified on her own behalf to the following:

1. She was a former member of the Maniac Latin Disciples.

2. On May 11, 1992, she was angry over the murder of her friend and sought revenge against the Latin Kings.

3. She, Montanez, and Mendoza invited Cruz and Reyes, who they knew were Latin Kings, to Humboldt Park the evening of May 11-12, 1992.

4. Montanez shot Reyes.

5. Mulero shot Cruz.

6. Later that evening, she, Montanez, and Mendoza bragged about what they had done.

7. She now had remorse for the murders.

8. She never asked Roberts to have Montanez killed.

6

Id. at 1334-36. Mulero also testified that it was her idea to plead guilty:

> Mr. Lynch: Why [did you plead guilty]?
> Defendant: Because I knew I was guilty.
> Mr. Lynch: Did Mr. Lynch tell you to do that?
> Defendant: No.
> Mr. Lynch: You told Mr. Lynch to do that for you, right?
> Defendant: Yes.
> Mr. Lynch: Now you pled guilty because you knew you were guilty, is that what you said?
> Defendant: Yes.

People v. Mulero, No. 06-1325, slip. op. at 3 (Ill. App. Ct. Feb. 19, 2008).

The State then cross-examined Mulero. During the cross-examination, the prosecutor characterized Mulero's motion to suppress as a frivolous "legal maneuver," and asserted that the filing of such a motion demonstrated Mulero's lack of remorse. Mulero, 680 N.E.2d at 1337. The jury found unanimously that the mitigating factors were insufficient to preclude the death sentence, and the Court accordingly sentenced Mulero to death. Id. at 1335.

Mulero then filed a motion pro se to withdraw her plea of guilty and vacate her sentence, asserting that her plea was involuntary, and that Lynch's representation of her was inadequate. Mulero, 06-1325, slip op. at 3. The Court appointed the Cook County Office of the Public Defender to represent Mulero. Id. At the motion hearing, Lynch testified that:

1. Mulero first broached the idea of pleading guilty.

2. He told her to think it over and that they would discuss this option at their next meeting.

3. At their next meeting, they discussed the pros and cons of pleading guilty and the weight of the State's evidence against her, including her confession and the television news tape of her shouting and flashing gang signs.

4. Mulero decided to plead guilty, and told him this at their third meeting.

5. During the course of his representation of Mulero, he reviewed all discovery materials, and spoke with Mulero's previous attorneys as well as Montanez and Mendoza's attorneys.

6. He did not interview Jackie Serrano ("Serrano"), who told the police she saw someone of Montanez's height shoot Cruz, or any other witnesses.

7. He did not consult with any experts or specialists.

Id. at 3-4. Dr. Michael Kovar, a clinical psychologist, testified that Mulero could not have knowingly and intelligently pled guilty because she was "suggestible and had a borderline I.Q." Id. at 4. Mulero testified that Lynch coerced her into pleading guilty. Id. The Circuit Court found that the psychologist's testimony was not credible, Lynch's testimony was credible, and that it was Mulero's idea to plead guilty. Id. at 5. The Court denied the motion. Id.

Under Illinois law, the case then proceeded directly to the Illinois Supreme Court, where the Office of the State Appellate Defender represented Mulero. The Illinois Supreme Court affirmed Mulero's convictions, but vacated her death sentence, finding that the prosecutor's cross-examination of Mulero was "wholly improper and unquestionably prejudicial." Mulero, 680 N.E.2d at 1338.

> [W]e hold that defendant's filing of a motion to suppress was irrelevant both substantively and for impeachment purposes at the sentencing hearing. The prosecutor improperly used defendant's constitutional right to silence against her by introducing into evidence her motion to suppress, which was intended to enforce that right. Defendant was prejudiced by the prosecutor's actions and deprived of a fair capital sentencing hearing because the sentencing jury was permitted to rely on improper evidence and comments. Accordingly, we vacate defendant's death sentence and remand for a new sentencing hearing.

Id. at 1340.

The Public Defender's Office represented Mulero during the new hearing. Resp.'s Ex. KK, at O-1. After hearing testimony, the jury found that Mulero should not be given the death sentence, and the Circuit Court accordingly sentenced Mulero to natural life in prison without the possibility of parole. Id., at O-191-92. On appeal, the Public Defender filed a brief pursuant to Anders v. California, 386 U.S. 738 (1967), in which counsel explained that there were no meritorious issues to present on Mulero's behalf. Mulero, 99-825, slip op. at 1-2. The Appellate Court agreed that there were no arguable issues and affirmed Mulero's sentence. Id. at 2. Mulero did not file a Petition for Leave to Appeal ("PLA") to the Illinois Supreme Court.

Mulero filed four separate versions of a state Post-Conviction Petition between 1996 and 2006. The Office of the Illinois Appellate Defender and the Cook County Public Defender's Office represented Mulero during her state Post-Conviction proceedings. Mulero made various assertions in these Petitions, including the claim that Lynch was constitutionally ineffective. Because Mulero's instant § 2254 Petition alleges only that Lynch's representation of her was ineffective, and because Respondent asserts that many of Mulero's instant claims are procedurally barred, the Court will outline the specific issues she raised under the broad category of ineffective assistance by Lynch.

She filed the first of her state Post-Conviction Petitions on June 3, 1996, while the Illinois Supreme Court was still considering her convictions and death sentence on direct appeal. She asserted that Lynch was constitutionally ineffective for the following reasons:

1. He failed to interview police officers or prosecution witnesses, including Serrano, who testified at Montanez's trial and may have provided exculpatory evidence for Mulero.

2. Even though he had never tried a capital case prior to representing Mulero, he failed to

consult with any other attorneys, psychologists, experts, or investigators before advising
Mulero to enter a blind plea of guilty to double homicide.

3. His representation of Mulero was tainted by a conflict of interest, as he was hired by
an individual known as "Boss Maniac," the leader of the Maniac Latin Disciples, and he
previously represented members of the Latin Kings.

4. He failed to adequately advise Mulero as to her plea options and the consequences of a
blind plea of guilty.

5. He failed to investigate Mulero's claim of innocence.

6. He failed to investigate mitigation evidence.

Resp.'s Ex. P, Mulero's Verified Pet. for Post-Conviction Relief, at 10-13.

In July 1997, Mulero filed an Amended Petition for Post-Conviction Relief, asserting
substantially similar issues related to ineffective assistance of counsel, and adding the following
allegations:

1. Lynch failed to request a plea negotiation conference.

2. Lynch failed to properly investigate Mulero's state of mind at the time of her
confession.

Resp.'s Ex. N, Am. Pet. for Post-Conviction Relief, at 2. In November 2001, Mulero filed a
Supplemental Petition for Post-Conviction Relief again asserting substantially the same issues
related to ineffective assistance. Resp.'s Ex. M, Supp. Pet. for Post-Conviction Relief, at 2.
Finally, in March 2006, Mulero filed her second Supplemental Post-Conviction Petition, in
which she expressly incorporated her original Post-Conviction Petition and asserted the
following additional issues related to Lynch's allegedly ineffective assistance of counsel:

1. His failure to explore or present any viable defenses.

2. His failure to investigate Rodriguez's motive to lie about Mulero's involvement in the murders.

3. His failure to stipulate to a bench trial so that certain issues could be preserved for appeal.

4. His failure to investigate whether her confession was coerced.

5. His failure to investigate and present evidence that the bullet trajectories supported Mulero's claim of actual innocence.

See generally Resp.'s Ex. S, Supp. Post-Conviction Pet.

On May 5, 2006, after hearing oral argument on the State's motion to dismiss the Petition, the Circuit Court granted the State's motion, stating:

> This can only happen in America where somebody gets this many shots after a plea of guilty and I took the plea and you're talking about coercion. I asked [Mulero] specifically, the facts were read off of the charging documents are these the offenses to which you're pleading guilty. She said, yes. Later on during the taking of the plea, I asked her if anyone was forcing her to plead guilty? She said, no. I said did anyone promises [sic] you anything prior to pleading guilty? She said, no. That should be dispository of this whole issue, but that isn't what happened and [the prosecutor] got a real good point, the Jury on the death sentence was out about two hours and came back and recommended death. All right, now she is sitting over in the jail and she says I better try to withdraw that plea. That was litigated, taken up on appeal. I was affirmed on that. This just goes on forever. As long as I'm sitting on this bench, she'll never file another [Post-Conviction Petition] unless she has some newly discovered evidence. She has already disposed of the competency of both lawyers, the Appellate attorney and the trial attorney. This is frivolous and this could only happen in this system that goes on, and on, and on, where there is no finality, never. I have [Post-Conviction Petitions] on my call that happened 20 years ago. They just keep coming and nine out of ten times, they're totally grasping at straws . . . Motion to dismiss is granted.

Resp.'s Ex. CC, Tr., at U-21-22.

On appeal, Mulero presented the following issues in support of her assertion that Lynch was ineffective:

1. He failed to investigate the eyewitness Serrano, who reported that she saw the taller of the three girls (Montanez) shoot Cruz.

2. He failed to investigate Rodriguez, whose testimony at trial could have been impeached because she had a motive to lie, and once stated that Montanez shot both victims.

3. He failed to interview any other witnesses.

4. He failed to present any evidence from a mental health professional that would have supported a defense at trial that Mulero's confession was involuntary.

5. He failed to fully investigate any other potential defenses Mulero may have had before advising her to plead guilty.

6. He failed to consult with any attorneys experienced in death penalty cases or experts while representing Mulero.

See generally Resp.'s Ex. D, Br. and Argument for Pet.-Appellant. The Appellate Court affirmed, finding that Lynch's performance did not prejudice Mulero. Mulero, 06-1325, slip op. at 8-9.

Mulero filed a PLA with the Illinois Supreme Court on March 28, 2008, asserting the following issues related to ineffective assistance of counsel:

1. Lynch had never litigated a capital case, and failed to properly educate himself as to how to proceed.

2. He did not request a plea negotiation conference.

3. He did not consult with any other attorneys experienced in death penalty cases, or consult with any experts or investigators.

4. He did not investigate or present evidence that Mulero was incompetent to plead guilty.

5. He did not investigate or present evidence that Mulero was actually innocent.

6. He did not investigate or present evidence that her confession was involuntary.

7. He did not investigate Rodriguez, who had a motive to lie and gave conflicting accounts of the murders.

8. He did not interview any witnesses who spoke with Montanez immediately after the murders.

9. He did not interview Serrano.

10. He did not investigate Serrano's vantage point to the murders.

11. He had a conflict of interest, as he was retained by the leader of the Maniac Latin Disciples.

Resp.'s Ex. G, PLA, at 11-15. The Illinois Supreme Court denied Mulero's PLA on May 29, 2008. People v. Mulero, 889 N.E.2d 1120 (Ill. 2008).

## 2. Proceedings before the District Court

Mulero filed her Petition for Writ of Habeas Corpus – Person in State Custody pursuant to 28 U.S.C. § 2254 on May 26, 2009. Mulero's sole claim in her Petition is that she received constitutionally ineffective assistance of counsel from Lynch. Mulero offers the following assertions in support of this claim:

1. Lynch did not properly investigate Mulero's claim of actual innocence. Mulero makes four separate factual allegations in support of this assertion:

    A. He failed to investigate Serrano and Rodriguez, two important witnesses whose credibility was weak.

    B. He failed to investigate the factual circumstances of the murders.

    C. He failed to investigate the circumstances under which she confessed. Had he done so, he may have been able to successfully argue that the confession was coerced.

    D. He failed to develop any sort of defense.

2. He did not adequately advise Mulero of the adverse consequences of a blind plea of guilty.

3. He did not consult with any other attorneys, death penalty case experts, or specialists in violation of recognized American Bar Association ("ABA") standards for capital representation.

4. He had a conflict of interest, as he was hired by the leader of the Maniac Latin Disciples.

5. He did not attempt to negotiate a plea bargain before allowing his client to enter a blind plea of guilty to double homicide, a capital offense.

Pet. for Writ of Habeas Corpus, at 8-15.

In addition to her ineffective assistance claim, Mulero makes a claim of actual innocence in her Reply brief. Traverse to Resp's. Answer, at 14-18. In support of this claim, Mulero asserts:

1. Montanez shot both Cruz and Reyes.

2. She had no knowledge that Montanez intended to shoot anyone the evening of May 11-12, 1992.

3. Her confession was coerced and involuntary.

Id.

Respondent filed a Response to Mulero's Petition, along with the State court record, on August 24, 2009. Mulero filed her Reply brief on December 18, 2009. The Petition is fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

Mulero's Petition is governed by 28 U.S.C. § 2254(d), which sets a high hurdle for habeas relief. This statute states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established Supreme Court precedent "if the state court either incorrectly laid out governing United States Supreme Court precedent, or, having identified the correct rule of law, decided a case differently than a materially factually indistinguishable Supreme Court case." Sutherland v. Gaetz, 581 F.3d 614, 616 (7th Cir. 2009)

(citing Calloway v. Montgomery, 512 F.3d 940, 943 (7th Cir. 2008)).  A state court's decision is an "unreasonable application" of clearly established Supreme Court law when:

> a state court identifies the correct governing legal rule but unreasonably applies it to the facts of a case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context in which it should not apply or unreasonably refuses to extend that principle to a new context in which it should apply.

Id. (citing Muth v. Frank, 412 F.3d 808, 814 (7th Cir. 2005)).  In order for a state court decision to be considered "unreasonable" under this standard it must be more than incorrect, it must lie "well outside the boundaries of permissible differences of opinion."  Hardaway v. Young, 302 F.3d 757, 762 (7th Cir. 2002); see also Schultz v. Page, 313 F.3d 1010, 1015 (7th Cir. 2002) ("The state court decision is reasonable if it is minimally consistent with the facts and circumstances of the case.").

Before reviewing the Illinois courts' decisions, however, this Court must determine whether Mulero fairly presented her federal claims to the state courts.  Section 2254(b) provides that "[a]n application for a writ of habeas corpus . . . shall not be granted unless . . . the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1).  In order to satisfy this exhaustion requirement, habeas petitioners must "fairly presen[t] federal claims to state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  Johnson v. Pollard, 559 F.3d 746, 751 (7th Cir. 2009) (quoting Duncan v. Henry, 513 U.S. 364, 365 (1995)).  A federal habeas petitioner must therefore "present his federal claims at each level of the state's established review process."  Id. (citing Woodford v. Ngo, 548 U.S. 81, 92 (2006) ("A state prisoner is generally barred from obtaining federal habeas relief unless the prisoner has properly presented his or her claims

16

through one complete round of the State's established appellate review process.")). Thus, a habeas petitioner procedurally defaults any claim not raised at all levels of state court review.

A federal court may excuse a § 2254 petitioner's procedural default only where the "petitioner can show either cause for the default and actual prejudice as a result of the alleged violation of federal law, or can demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice." Smith v. McKee, 598 F.3d 374, 382 (7th Cir. 2010). A "cause" is defined as "an objective factor, external to the defense, that impeded the defendant's efforts to raise the claim in an earlier proceeding." Id. "Prejudice" means "an error which so infected the entire trial that the resulting conviction violates due process." Id. The "fundamental miscarriage of justice" exception requires a showing of actual innocence. Id. at 388-89 (citing Schlup v. Delo, 513 U.S. 298, 327 (1995)).

With the above principles in mind, the Court examines Mulero's Petition.

**B. Procedural Default**

Respondent asserts that some of Mulero's ineffective assistance claims are procedurally barred because she did not present them for each level of review during her state Post-Conviction proceedings. Although Mulero has asserted an ineffective assistance of counsel claim at every step of her state Post-Conviction proceedings, the factual allegations she provided in support of her ineffective assistance claim changed slightly each time she presented that claim to the state courts. Mulero has therefore not raised some of her factual allegations at each step of the state court Post-Conviction process. Respondent correctly asserts that when a specific factual allegation in support of an ineffective assistance claim is not brought before the state courts for one full round of review, it is procedurally barred. Pole v. Randolph, 570 F.3d 922, 934-35 (7th

Cir. 2009) ("if a petitioner fails to assert in the state courts a particular factual basis for the claim of ineffective assistance, that particular factual basis may be considered defaulted.") (citing Stevens v. McBride, 489 F.3d 883, 894 (7th Cir. 2007)). The Court must therefore determine which of Mulero's factual allegations in support of her instant claim of ineffective assistance have been presented at each level of her state court Post-Conviction proceedings and which have not. Those that have not been presented for all three levels of state court review are procedurally barred unless Mulero can demonstrate cause for the default, prejudice therefrom, or that she is actually innocent. See Smith, 598 F.3d at 382.

Mulero supports her first assertion, that Lynch did not properly investigate her claim of actual innocence, with four separate factual allegations: that Lynch failed to interview certain witnesses, investigate the facts of the crime, investigate the circumstances of Mulero's confession, or present a defense. After examining Mulero's state court Post-Conviction submissions, the Court finds that she has presented all four of these factual allegations for a full round of review. Mulero's first assertion is therefore not procedurally barred. Next, Mulero asserts that Lynch did not adequately advise her of the adverse consequences of pleading guilty. Mulero raised this issue in her Post-Conviction Petition in the Circuit Court, but did not raise this issue on appeal or in her PLA. This assertion is therefore procedurally barred. Mulero's third assertion is that Lynch failed to consult with other attorneys and experts in order to educate himself in how to properly proceed in a capital case. She presented this claim to each level of state court review during her Post-Conviction proceedings, so it is not barred. Finally, Mulero did not present her fourth or fifth claims, that Lynch had a conflict of interest and failed to

attempt a plea negotiation, for review by the Illinois Appellate Court, so these claims are procedurally barred.

Mulero has not provided the Court with good cause for defaulting the second, fourth, and fifth issues she raises in her instant § 2254 Petition. See id. (explaining that in order to demonstrate "cause" for procedurally defaulting an issue, a habeas petitioner must show that some factor external to her claim impeded her ability to present the issue during the earlier proceeding). Nor has she made a showing of actual innocence.[1] See id. (if a habeas petitioner cannot demonstrate cause for procedurally defaulting an issue and prejudice therefrom, she must demonstrate actual innocence in order to avoid default). The Court therefore cannot excuse her default of these issues, and finds that they are procedurally barred. With an abundance of caution, however, the Court will proceed to examine each of Mulero's claims on their merits.

## C. Mulero's Claims under § 2254

As the Court has noted, Mulero's only claim in her § 2254 Petition is that Lynch was constitutionally ineffective. In order to establish this, Mulero must "show that [Lynch's] performance was deficient, and that the deficiency prejudiced [her] defense." See Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). An attorney's performance is deficient if it falls "below an objective standard of reasonableness." Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 688). Prejudice is established by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the

---

[1] The Court will examine Mulero's claim of actual innocence in section II. C. 6. of this Opinion.

result of the proceeding would have been different." Gentry v. Sevier, 597 F.3d 838, 851 (7th Cir. 2010) (quoting Strickland, 466 U.S. at 694).

When a court reviews an ineffective assistance of counsel claim, the court's review is "highly deferential" to the attorney, "with the underlying assumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'" United States v. Holman, 314 F.3d 837, 840 (7th Cir. 2002) (quoting Strickland, 466 U.S. at 689). There is therefore a strong presumption that Lynch performed reasonably. See Strickland, 466 U.S. at 690; see also Cooper v. United States, 378 F.3d 638, 641 (7th Cir. 2004). To succeed, Mulero must show "errors so serious that [Lynch] was not functioning as 'counsel' guaranteed [to her] by the Sixth Amendment . . . ." See Holman, 314 F.3d at 839 (quoting Strickland, 466 U.S. at 687).

### 1. Failure to Investigate Mulero's Claim of Actual Innocence

Mulero first asserts that Lynch failed to investigate her claim of actual innocence. In support of this assertion, she maintains that Lynch failed to investigate the factual background of the murders, failed to interview Serrano and Rodriguez, failed to investigate the circumstances under which she confessed, and failed to develop a defense. The state court record, however, belies this claim.

Even though Lynch admitted that he did not interview Serrano and Rodriguez, Lynch testified during the hearing on Mulero's motion to withdraw her guilty plea that he was aware that Serrano may have seen Montanez shoot Cruz, and that he was also aware that Rodriguez had told the police that Montanez shot Cruz. Mulero, 06-1325, at 8. Lynch also testified that he discussed this evidence with Mulero. Id. The Illinois Appellate Court found Lynch's testimony credible, id., and Mulero has offered this Court no reason to find otherwise. Lynch admitted that

he failed to discover that Rodriguez had a motive to lie about Mulero's involvement in the murders, but the Appellate Court found that if Lynch had this knowledge it would not have changed the outcome of a trial for Mulero, given the overwhelming evidence against her, including her confession, Montanez's confession which implicated Mulero, the videotape of Mulero shouting and flashing gang signs, the forensic evidence, and Rodriguez's testimony. Id. at 8-9. This Court has no reason to question the Illinois Appellate Court's finding. Moreover, Lynch testified credibly that he reviewed all the discovery materials provided by the State, and spoke with Mulero's previous attorney as well as Montanez's and Mendoza's attorneys about the case. Id. at 4. In addition, Mulero's claim that Lynch did not investigate Mulero's confession is simply false. After interviewing Mulero and examining discovery materials, Lynch presented a motion to suppress Mulero's confession in which he argued that Mulero did not understand her Miranda rights and that the police psychologically coerced her into confessing. See Mulero, 680 N.E.2d at 1332. Given this record, the Court determines that Lynch's investigation of the murders and his decision not to present any defenses at a trial met the minimum standard of reasonableness under Strickland. Mulero's first assertion in support of her Petition therefore fails.

### 2. *Failure to Advise Mulero as to the Adverse Consequences of Pleading Guilty*

Mulero's second assertion is that Lynch failed to advise her of the adverse consequences of a guilty plea. During the hearing on Mulero's motion to withdraw her plea, however, Lynch testified that he discussed the pros and cons of pleading guilty with Mulero. Mulero, 06-1325, at 3-4. The Circuit Court found Lynch's testimony on that issue credible. Resp.'s Ex. BB, Tr., at H56-58. In addition, the Circuit Court asked Mulero at her plea hearing whether she understood

that by pleading guilty, she would be giving up certain rights, including her right to have a jury decide her guilt or innocence. Resp.'s Ex. V, Tr., at 177-78. Mulero replied that she understood the rights she was giving up. Id. Mulero also stated that she signed a jury waiver after conferring with Lynch, and confirmed that no one was forcing her to plead guilty. Id.; Resp.'s Ex. K, at C-34. There is thus no factual basis to support Mulero's second assertion in support of her Petition, and it therefore fails.

### 3. Failure to Consult

Next, Mulero contends that Lynch failed to consult with any other attorneys or death penalty case experts, in violation of recognized ABA standards for capital representation. In her Memorandum in support of her § 2254 Petition, Mulero directs the Court's attention to the 2003 ABA standards, but Respondent correctly points out that it is the 1989 ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (the "GUIDELINES") that would have been in effect during the time Lynch represented Mulero. In the following analysis, the Court will therefore refer to the 1989 GUIDELINES.

GUIDELINE § 8.1, "Supporting Services," provides that in order to provide "quality representation" in a death penalty case, defense counsel should have access to: "expert witnesses capable of testifying at trial and at other proceedings, personnel skilled in social work and related disciplines to provide assistance at pretrial release hearings and at sentencings, and trained investigators to interview witnesses and to assemble demonstrative evidence." Although Lynch did present a mental health expert to testify on Mulero's behalf during the hearing on her motion to withdraw her guilty plea, there is no indication in the record that Lynch availed himself of any of the other supporting services recommended by the GUIDELINES at any point during his

representation of Mulero. GUIDELINE § 8.1 emphasizes that "[c]ounsel, whether practicing privately or within a defender's office, cannot adequately perform [the tasks necessary in a capital case] without the assistance of investigators and other assistants."

Supreme Court case law, however, indicates that the GUIDELINES are not "inexorable commands with which all capital defense counsel must fully comply." Bobby v. Hook, 130 S. Ct. 13, 17 (2009) (internal quotation marks omitted). Instead, the GUIDELINES are "'only guides' to what reasonableness means, not its definition." Id. (quoting Strickland, 466 U.S. at 688); see also Rompilla v. Beard, 545 U.S. 374, 387 (2005) (providing that the GUIDELINES are a guide to determining whether counsel's performance was objectively reasonable). In evaluating Lynch's performance, the Court therefore may use the GUIDELINES as evidence of what a reasonable attorney in Lynch's situation would have done, but must ultimately measure Lynch's performance against an objective standard of reasonableness. Bobby, 130 S. Ct. at 17.

Lynch's performance, although perhaps less than laudible, met this minimum standard. As to his decision to allow Mulero to plead guilty, the record in this case indicates the following:

1. His client confessed to participating in two intentional homicides, expressed no remorse for her actions during her confession, and, following this confession, displayed gang signs and shouted slogans indicating that she was a "King Killer" for television news cameras. Mulero, 680 N.E.2d at 1331-34.

2. After interviewing Mulero and examining discovery materials, Lynch filed a motion to suppress Mulero's confession based on four separate grounds, including coercion. Id. at 1332. The Circuit Court denied the motion. Id.

3. The State had forensic evidence regarding the shootings and Rodriguez's statement

implicating Mulero. Id. at 1332.

4. Perhaps most importantly, Mulero informed the Circuit Court at her plea hearing that she had consulted with Lynch regarding the rights she was giving up, and that she had decided to plead guilty. Resp.'s Ex. BB, Tr., at H56-58; Resp.'s Ex. V, Tr., at 177-78. During her testimony at her first sentencing hearing, Mulero confirmed that she was the one who made the decision to plead guilty. Mulero, 06-1325, at 3.

Given this record, the Court cannot say that Lynch's decision to allow Mulero to plead guilty did not meet an objective standard of reasonableness. See Holman, 314 F.3d at 839 (in order to establish ineffective assistance, a petitioner must show that counsel was not acting as the "'counsel' guaranteed [to him] by the Sixth Amendment.").[2] At the aggravation/mitigation phase of Mulero's sentencing hearing, the record indicates that Lynch presented mitigating evidence from: Cook County Jail employees who testified favorably as to Mulero's general disposition; Mulero's mother, who testified that Mulero loved her children and enjoyed visiting with them; and Mulero herself, who expressed remorse for the murders. Mulero, 680 N.E.2d at 1334-35. Given this record, the Court also cannot say that Lynch's performance at the sentencing phase was not objectively reasonable. See Holman, 314 F.3d at 839.

The Court acknowledges that Lynch did not consult with any investigators or assistants during his representation of Mulero, and that his failure to do so did not meet the applicable ABA GUIDELINES for defense counsel in capital cases. However, taking the GUIDELINES as mere guides, see Bobby, 130 S. Ct. at 17, the Court determines that Lynch's representation of Mulero

---

[2] Moreover, the ultimate decision whether to plead guilty rested with Mulero. Roe v. Flores-Ortega, 528 U.S. 470, 485 (2000).

24

as a whole met an objective standard of reasonableness. Mulero's third claim in support of her Petition therefore fails.

### 4. Conflict of Interest

Mulero's fourth claim is that Lynch had a conflict of interest because he was hired by an individual known as "Boss Maniac," the leader of the Maniac Latin Disciples. Mulero speculates that this individual or others within the Maniac Latin Disciples' leadership structure ordered Cruz and Reyes' murders, and somehow influenced Lynch to persuade Mulero to plead guilty in order to cover up this plot. Mem. in Support of Pet., at 31. Mulero submits no evidence to support this assertion other than an affidavit in which she states that Lynch told her "that he had been hired by a man he referred to as Boss Maniac to defend me." Aff. of Marilyn Mulero, Resp. Ex. S., at 15. Mulero's mere speculation that Lynch had a conflict of interest is not enough to support this claim. Yang v. Pollard, 202 Fed. Appx. 134, 137 (7th Cir. Oct. 27, 2006) ("speculation alone cannot support an ineffective-assistance claim") (citing United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991)); Simmons v. Gramley, 915 F.2d 1128, 1134 (7th Cir. 1990). Mulero's fourth claim in support of her Petition therefore fails.

### 5. Failure to Negotiate a Plea

Mulero's fifth claim is that Lynch did not attempt to negotiate a plea bargain before allowing her to enter a blind plea of guilty to the murders. Respondent correctly points out, however, that Lynch testified that the State refused to participate in a pretrial plea conference, Resp.'s Ex. Z, at A-18, and Mulero presents no evidence to the contrary. There is thus no factual basis in the record to support this claim.

In addition, there is no bright-line rule that allowing a client to enter a blind plea necessarily constitutes ineffective assistance of counsel. Bracy v. United States, No. 07-679, 2010 U.S. Dist. LEXIS 18459, at *22 (S.D. Ala. March 2, 2010) (citing Braun v. Ward, 190 F.3d 1181 (10th Cir. 1999)). In fact, such a decision may well represent sound strategy. Id. (citing Chandler v. United States, 218 F.3d 1305, 1314 n.14 (11th Cir. 2000)); see also Fields v. Gibson, 277 F.3d 1203, 1271 (10th Cir. 2002) (finding counsel's decision to recommend a blind plea objectively reasonable).

The Court acknowledges that entering a blind plea in a capital murder case may provide little benefit for a defendant. See Florida v. Nixon, 543 U.S. 175, 191 (2004) ("If no written guarantee can be obtained that death . . . will not be imposed following a plea of guilty, counsel should be extremely reluctant to participate in a waiver of the client's trial rights."). However, where there is overwhelming evidence of a defendant's guilt, as there was in this case, counsel's decision to enter a blind plea and focus on saving the client's life at the penalty phase of the proceedings may be a reasonable one. Id. at 191-92 (citing Lyon, Defending the Death Penalty Case: What Makes Death Different?, 42 MERCER L. REV. 695, 708 (1991) ("It is not good to put on a 'he didn't do it' defense and a 'he is sorry he did it' mitigation. This just does not work."); Sundby, The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty, 83 CORNELL L. REV. 1557, 1589-91 (1998) ("interviews of jurors in capital trials indicate that juries approach the sentencing phase 'cynically' where counsel's sentencing-phase presentation is logically inconsistent with the guilt-phase defense.")).

Given the extent of the State's evidence in this case, the Court finds that Lynch's decision to allow Mulero to plead guilty and to focus his efforts on the penalty phase was reasonable. The

Court also notes that following the Illinois Supreme Court's decision vacating Mulero's death sentence, Mulero received a life sentence. Mulero, 99-825, at 1. Lynch's decision thus ultimately did not prejudice Mulero. Mulero's fifth claim in support of her Petition therefore fails.

### 6. Actual Innocence

In her Memorandum of Points and Authorities in Support of Traverse to Respondent's Answer (Mulero's Reply brief), Mulero asserts that she is actually innocent of the murders. Mulero does not explain whether she is attempting to assert her innocence in an attempt to avoid the procedural default of her other claims, or whether she is making a freestanding claim of innocence.

As the Supreme Court has explained, one way for a habeas petitioner to avoid procedural default is to make a showing of actual innocence. Schlup, 513 U.S. at 327. In order to avoid procedural default by demonstrating actual innocence, the petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in light of . . . new evidence." Bell v. Pierson, 267 F.3d 544, 551 (7th Cir. 2001) (quoting Schlup, 513 U.S. at 327). If Mulero is asserting a claim of actual innocence in order to avoid procedural default, she must therefore submit new evidence of her innocence. Id. The Court must then make a factual finding as to whether her new evidence is credible. Id. If the new evidence is not credible, the claims that the Court has found to be defaulted will remain defaulted. Id.

If Mulero is making a freestanding claim of actual innocence, i.e. a claim of innocence unrelated to any attempt to avoid procedural default, she has a steeper mountain to climb. First, it is not certain that freestanding claims of innocence are cognizable in federal habeas corpus

27

petitions. In <u>In re Davis</u>, the Supreme Court remanded a habeas petition to the Southern District of Georgia for a hearing to determine "whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence." 130 S. Ct. 1, 1 (2009). However, Justice Scalia explained in dissent that "we have repeatedly . . . express[ed] considerable doubt that any claim based on alleged 'actual innocence' is constitutionally cognizable." <u>Id.</u> at 3 (citing <u>House v. Bell</u>, 547 U.S. 518, 555 (2006); <u>Herrera v.Collins</u>, 506 U.S. 390, 400-01 (1993)). If such a claim is cognizable, as the <u>Davis</u> majority seemed to indicate, the standard for relief is high. <u>Davis</u>, 130 S. Ct. at 2 (explaining that a habeas petitioner presenting "new evidence conclusively and definitely proving, beyond any scintilla of a doubt, that he is an innocent man," would be entitled to relief) (Stevens, J., concurring); <u>Herrera</u>, 506 U.S. at 417 (commenting that if freestanding innocence claims were cognizable, the threshold for such claims would be "extraordinarily high.").

Whether Mulero is asserting her innocence in an attempt to avoid procedural default, or is making a freestanding claim of innocence, the Court must first examine the evidence she has presented that might support her claim. This evidence includes:

1. Two affidavits from capital litigation investigators. These affidavits indicate that the investigators interviewed Serrano in July 1997, and that Serrano stated that the "taller of the three women walked behind a male and shot him." Pet.'s Ex. B, ¶ 6; Pet.'s Ex. C, ¶ 6.

2. An affidavit from Mulero, which states that Montanez shot both Cruz and Reyes. Pet.'s Ex. E, ¶ 4.

3. Sworn statements from Magnolia Wright and Maria Ramos, inmates at the Dwight Correctional Center, taken in April 1996. Wright and Ramos state that Montanez

admitted to shooting both Cruz and Reyes. Pet.'s Ex. F, at 5-7; Pet.'s Ex. G, at 4.

4. Affidavits from Michael Deppe and Joseph Kirk, Chicago police officers who investigated the murder scene in June 1999. Deppe and Kirk state that it was physically impossible for Serrano to have seen the murders from her apartment. Pet.'s Ex. H., ¶ 3; Pet.'s Ex. I, ¶ 3.

5. A Neuropsychological Evaluation conducted by Dr. Michael M. Gelbort, which concludes that Mulero suffers from "verbal learning and reasoning deficits, and functioning on tests of frontal lobe abilities [presented] in the cognitively impaired or brain damaged range of abilities," and also suffers from "paranoid tendencies, anxiety, dysphoria, and difficulty understanding and planning how to meet her interpersonal needs." Pet.'s Ex. K, at 4.

6. A Psychological Examination by Dr. Michael D. Kovar which explained that although Mulero suffers from certain cognitive deficits, she was competent to waive her Miranda rights at the time of her confession. Pet's Ex. L, at C-257. Kovar also determined, however, that Mulero was not competent to make a knowing and intelligent plea of guilty. Id.

The Court first notes that none of this evidence is, properly speaking, "new." Dr. Kovar testified on Mulero's behalf during her hearing on her motion to withdraw her plea, and his report is dated December 4, 1994. Mulero, 680 N.E.2d at 1344-46; Pet.'s Ex. L, at C-258. Mulero presented the capital litigation investigators' affidavits, Mulero's affidavit, Deppe's affidavit, Kirk's affidavit, and the Dwight inmates' statements to the state courts during Mulero's Post-Conviction proceedings. The origin of Dr. Gelbort's report is unclear, but this report is

dated April 4, 1997. More importantly, after examining this evidence, the Court is not convinced

that it would have changed the outcome of a trial, had Mulero declined to plead guilty, given the

overwhelming evidence amassed by the State. See Bell, 267 F.3d at 551 (explaining that in order

to defeat procedural default by establishing actual innocence, a habeas petitioner must show that

no reasonable juror would have voted to convict in light of the new evidence). This evidence

also does not come close to meeting the very high standard required to establish a freestanding

claim of actual innocence. See Davis, 130 S. Ct. at 2; Herrera, 506 U.S. at 417. Mulero's claim

of actual innocence therefore fails.

## D. Evidentiary Hearing

Mulero asserts that the Court should hold an evidentiary hearing on her claims. Mulero is

entitled to an evidentiary hearing if "(1) [s]he has alleged facts, which, if proved, would entitle

[her] to habeas relief and (2) the state courts for reasons beyond [her] control, never considered

[her] claim in a full and fair hearing." Ward v. Jenkins, 613 F.3d 692, 698 (7th Cir. 2010). The

Court has carefully considered the merits of all of Mulero's ineffective assistance claims, even

those it found procedurally barred, and it found that none of Mulero's allegations entitle her to

habeas relief. In addition, the state courts fully considered, and rejected, Mulero's claims of

ineffective assistance of counsel during Post-Conviction proceedings. As to Mulero's actual

innocence claim, the Court determined that it remained unclear whether the "new" evidence

presented by Mulero would have led to a not guilty verdict had this case gone to trial. Her

allegations in support of actual innocence, even if they were true, thus do not entitle her to habeas

relief. See Davis, 130 S. Ct. at 2; Herrera, 506 U.S. at 417 (noting the high standard for actual

innocence claims). The Court therefore finds that Mulero is not entitled to an evidentiary hearing.

### E. Certificate of Appealability

Mulero does not have the absolute right to appeal the Court's denial of her Petition. She may, however, file an appeal if the Court grants her a Certificate of Appealability ("COA"). See 28 U.S.C. § 2253(c). Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court, the Court must determine at the time it enters a final order whether it should grant Mulero a COA. If the Court decides to grant a COA, it must identify the specific issue or issues appropriate for appellate review. Rule 11(a).

Mulero is entitled to a COA only "if [she] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Under this standard, the Court should grant her a COA if "reasonable jurists could debate whether (or, for that matter, agree that) [Mulero's] petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 335 (2003). The Court first finds that the issues which it has determined are procedurally defaulted could not have been resolved in a different manner. See Slack v. McDaniel, 529 U.S. 473, 484 (2000) (where it is not debatable that an issue is procedurally barred, the Court should not grant a COA on that issue.). However, the two issues which survived default – the questions of Lynch's effectiveness with respect to his investigation of the murders and his failure to consult with any other investigators or experts in violation of the applicable ABA GUIDELINES – deserve further review by the Appellate Court. The Court therefore issues a COA as to the following two issues:

1. Whether Lynch's limited investigation into the facts of the murders, particularly his admitted failure to interview any witnesses, constitutes ineffective assistance of counsel.

2. Whether Lynch's failure to procure any supporting services, including experts or investigators, in violation of ABA death penalty case GUIDELINES, constitutes ineffective assistance of counsel.

### III. CONCLUSION

For the foregoing reasons, Mulero's Petition for Writ of Habeas Corpus – Person in State Custody is denied. The Court issues a Certificate of Appealability on the two issues identified in section II. E. of this Opinion.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

Dated: Nov. 19, 2010